**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff | : | Case No. 2:06-CR-146 |
| vs. | : | JUDGE GRAHAM |
| WENDELL CALLAHAN, | : | |
| Defendant. | | |

**DEFENDANT'S SENTENCING MEMORANDUM**

In *United States v. Booker*, 543 U.S. 220, 245 (2005), the Supreme Court's remedial opinion rendered the guidelines effectively advisory requiring sentencing courts to consider guideline ranges but permitting the courts to tailor the sentence in light of other statutory concerns as well.

In order to arrive at a fair punishment for Mr. Callahan, this Court should (1) calculate the guideline range correctly; (2) determine whether to grant a downward departure or an upward departure from the guidelines; and (3) recognize the Court's discretion to deviate from the guidelines and consider the factors set forth in 18 U.S.C. § 3553(a) in exercising it's independent judgment about what an appropriate sentence should be. *United States v. Buchanan*, 449 F.3d 731, 738-739 (th Cir. 2006) (Sutton, J., concurring).

**Guideline Calculations and Departure**

The probation officer has made the following guideline calculations for Mr. Callahan.

| | |
|---|---|
| Base offense level Count 1 § 2D1.1(c)(6) | 28 |
| Base offense level Count 2 § 2K2.1(a)(1) | + 20 |
| Multiple Count Adjustment | + 29 |
| Acceptance of Responsibility Reduction § 3E1.1(a) | -  3 |
| | 26 |

  Criminal History Category   VI

  Advisory Guideline Range   120-150 months

  Mr. Callahan does not take issue with the probation officers calculation of the appropriate guideline range.

  The probation officers has not identified any factors that would merit either an upward or downward departure from the sentencing guidelines.  Defense counsel is unable to point to factors which would justify a downward departure.

**Statutory Factors**

  The primary directive in § 3553(a) is for sentencing courts to "impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph 2."  Section 3553(a) states that these purposes are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

  Congress has set forth a list of applicable sentencing factors within § 3553(a)(1)-(7) that must now be considered during the sentencing process.  In support of his argument for deviation, Mr. Callahan relies on the following § 3553(a) sentencing factors:

  1.  The nature and circumstances of the offense - § 3553(a)(1);

  2.  His history and personal characteristics - § 3553(a)(1);

  3.  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense - § 3553(a)(2)(A); and

4. The need to avoid unwarranted sentencing disparities - § 3553(a)(6).

5. The need for the sentence imposed to provide the defendant with needed educational and vocational training - § 3553(a)(2)(D).

**Nature and Circumstances of the Offense**

On July 23, 2005, Wendell Callahan was released from prison. (PSR ¶ 71). He returned home to live with his mother, Elaine Beard, at 541 Oakwood Avenue in Columbus, Ohio. Prior to Callahan's release from prison, law enforcement was investigating the selling of crack cocaine from the Oakwood address. A CI told the police than "Man" sold him a ½ ounce of crack from that address in June, 2005. "Man" was later identified as Robert Lamar Johnson. On August 29, 2005, a separate source advised ATF Agent Daniel Ozbolt that crack cocaine had been sold from the residence by Andre Johnson, Ms. Beard and Mr. Callahan. The CI further advised that Andre Johnson was in prison as of August 29, 2005.

On August 31, 2005, a CI was sent to 541 Oakwood. The CI asked to speak to "Man". Callahan came to the door and indicated that he was "Man". The CI informed Callahan that he was not the "Man" that the CI knew from a previous incarceration in Chillicothe. Callahan asked the CI what he was looking for and the CI stated he wanted a 1/4 ounce of crack. Callahan didn't have the crack, but after a short while, was apparently able to find a source. Callahan then sold the CI 4.1 grams of crack for $200.

Callahan met the CI on October 31, 2005 and sold him 8.1 grams of crack. Further, on November 3, 2005, Callahan sold the CI 11.71 grams of crack.

It is understandable that Mr. Callahan returned to his mother's home upon his release from prison. He was 24 years of age and had spent the vast majority of his adult life in prison. Rather than returning to a nurturing environment, Mr. Callahan returned to a residence from which crack

3

cocaine was being dealt. The CI came to the residence looking for the person who had been selling out of the residence. Mr. Callahan took the opportunity to become the middle-man on a $200 deal. He had two subsequent deals with the same CI.

The total amount of crack cocaine involved in the three sales is 23.91 grams. This amount is between 20 and 35 grams and leads to a base offense level of 28.

The repeat nature of this drug distribution activity is a factor that this Court can consider in arriving at a sentence that is sufficient, but not greater than necessary to satisfy Congress's mandate in sentencing. In *United States v. Nellum*, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005), one of the factors that Judge Simon considered in deviating from the guidelines was that there were four controlled sales of crack by Nellum to an informant yielding a relevant conduct quantity of 204 grams.

Judge Simon recognized that:

> [u]nder the guidelines, the weight of the narcotics is the driving force behind the sentence. The government is well aware that for every controlled buy that is made, the quantity of drugs is increased, and so is the sentence. There is a randomness to this in the following sense: Nellum's guideline range would have been significantly decreased if he was arrested after the first buy on January 12, 2004, and not after the fourth buy. Under the guidelines, this fortuity increased Nellum's guideline range from 87-108 months (if 27 grams of crack were involved), to 168-210 months. Indeed, on the other hand, if the officers wanted to, they probably could have made additional controlled buys from Nellum and the total weight of the drugs attributable to him would have been even higher and so too his sentence under the guidelines. None of this is meant as a criticism of the agents involved in this or any other drug investigation. To be sure, they are serving the public by ridding the streets of drugs, and every controlled purchase that is made is one less sale to a drug addict on the street. It is nonetheless difficult to ignore the random nature of how the system plays out in reality.

*Id.* at *5.

One other factor merits discussion here. Callahan's last interaction with the CI was on November 3, 2005. Callahan was not arrested after the sale, and apparently law enforcement did not pursue further deals with Callahan. On April 5, 2006, Callahan was stopped for a traffic violation. During the search of the vehicle, a .25 caliber pistol was discovered. He was then arrested on the complaint in this case on a charge of being a felon in possession of a firearm. It is entirely possible that Callahan's case would not have been brought federally but for the traffic stop and resulting firearm seizure. In that situation, Mr. Callahan would not have faced the extreme penalties he now faces for total sales of less than one ounce of crack.

**Callahan's History and Personal Characteristics**

Wendell Callahan grew up without a father figure. He got into trouble at an early age and was committed to the custody of Franklin County Children's Services. (PSR ¶ 61). He served 30 days in jail when he was eighteen years old. (PSR ¶ 65). He went back to jail for 142 days and 77 days when he was nineteen years old. (PSR ¶ 67). While he was still nineteen years old, Callahan was sentenced to serve four years in prison. (PSR ¶ 69). He was released June 25, 2005 but was arrested again in October, 2004. (PSR ¶¶ 70, 71). He was then released on July 23, 2005.

In short, Mr. Callahan has spent most of his adult life in prison. Following his arrest in this case, Callahan was permitted to remain on bond. Mr. Callahan showed signs of turning the corner in his life. Callahan began regular full-time employment at Petsmart. Callahan took pride in his work and began to improve his self-image. Callahan reported as directed to Pretrial Services and has tested negative for drugs. Callahan was living with his girlfriend Erveena Broomfield and her two children.

Unfortunately, the couple had an argument and Ms. Broomfield's aunt called the police. Callahan was arrested for domestic violence and ended up losing his job. Wendell Callahan is a

young man who needs direction in his life. With help and direction, he can be a productive member of society.

**The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

The 100-to-1 ratio between crack and powder cocaine must be considered in arriving at a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). The sentence called for by the advisory guidelines is largely driven by the weight and type of drug. Possession with the intent to distribute 20-35 grams of crack is treated the same by the guidelines as is possession with the intent to distribute 2000-3500 grams of powder cocaine – both result in a base offense level of 28. USSG § 2D1.1. An offense involving crack is sentenced 100 times more harshly than an offense involving the same amount of powder cocaine.

For comparison purposes, it is interesting to note that if the guidelines treated powder and crack cocaine identically, Callahan's base offense level would be 12. USSG § 2D1.1. Nonetheless, Callahan recognizes that his Court is not free to legislate new ratios even through the existing ones have no basis in either physical or social sciences and have been repudiated by the very body that incorporated them into the guidelines. *United States v. Pho*, 433 F.3d 53, 55 (1st Cir. 2006). However, Callahan submits that this ratio can and must be considered after *Booker*.

The Sentencing Commission has issued a number of reports in which it concluded that the 100:1 ratio had no basis in science and was too severe. *See generally*, United States Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* (Feb. 1995), available at http://www.ussc.gov/crack/exec.htm; United States Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* (April 1997), available at http://www.ussc.gov/r_congress/NEWCRACK.PDF; United States Sentencing Commission, *Report to the*

*Congress: Cocaine and Federal Sentencing Policy* (May 2002) (hereafter "2002 Report"), available at http://www.ussc.gov/r_congress/02crack/2002crackrpt.htm; and United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Federal Sentencing Reform* (Nov. 2004) (hereafter "Fifteen Year Report"), available at http://www.ussc.gov/15_year/15year.htm.

In its 2002 Report, the Commission reported, in part, the following findings: (1) the current penalties exaggerate the relative harmfulness of crack cocaine; (2) the current penalties sweep too broadly and apply most often to lower level offenders; (3) the current penalties overstate the seriousness of most crack cocaine offenses and fail to provide adequate proportionality; and (4) the current penalties' severity mostly impacts minorities. Based upon its findings, the Commission unanimously concluded "that the various congressional objectives can be achieved more effectively by decreasing substantially the 100:1 drug quantity ratio." 2002 Report at v-viii.

Over the past ten years, the Commission's consistent conclusion has been that crack is punished too harshly relative to cocaine powder. Mr. Callahan submits that this Court should give great weight to the Commission's views on this issue in arriving at a sentence; certainly other district courts have given the Commission's perspective great weight. *See, United States v. Harris*, 2005 U.S. Dist. LEXIS 3958 (D.D.C. Mar. 7, 2005) (Robertson, J.) (Finding that Sentencing Commission's findings "are sound authority for the proposition that the sentencing ranges for [the defendants'] crime by the guidelines are greater than necessary"); *United States v. Smith*, 359 F. Supp. 2d 771 (E.D. Wisc. 2005) (Adelman, J.); *United States v. Thomas*, 360 F. Supp. 2d 238 (D. Mass. 2005) (Ponsor, J.); and *Simon v. United States*, 361 F. Supp. 2d 35 (S.D.N.Y. 2005) (Sifton, J.).

In *United States v. Gunter*, 462 F.3d 237 (3rd Cir. 2006), the Third Circuit Court of Appeals comprehensively weighed-in on what role the 100:1 ratio has in sentencing hearings post-*Booker*. Gunter's aggregate guideline range was 295-353 months for his firearms and possession with the intent to distribute crack convictions. Relying on *Booker*, at sentencing, Gunter moved the district court to treat the 100:1 ratio as advisory and impose a sentence below the guideline range. The district court rejected Gunter's argument and held that it was bound to apply the 100:1 ratio as it was established by Congress and could not be ignored by district courts. *Id*. at 239.

In its opinion, the Third Circuit conducted a comprehensive analysis of the institutional arguments surrounding the propriety of the 100:1 ratio. *Id*. at 239-240.

The panel in *Gunter* then surveyed the post-*Booker* legal landscape that has emerged in this area and agreed with its sister circuits that the following legal boundaries govern the various legal issues that are in play:

> [t]o recap, federal courts of appeals have unanimously held that (1) *Booker* does not require sentencing courts to impose below-Guidelines sentences in every crack case due to the crack/powder differential, and (2) sentencing courts may not craft their own ratio as a substitute for the 100:1 ratio chosen by Congress. Contrary to the Government's contentions, no circuit court has held that a sentencing court errs in simply considering the particular form of a drug involved in the offense as one of may individual factors in imposing a sentence. In this context, we decide a limited issue of first impression for our Court; whether the District Court erred as a matter of law in believing it could not sentence below the applicable Guidelines range for offenses involving crack cocaine.

*Id*. at 247.

The Third Circuit unanimously answered the question presented in *Gunter* in the affirmative by ruling that:

8

> . . . once between the minimum and maximum statutory ranges of 21 U.S.C. § 841(b), there is nothing special about the crack cocaine Sentencing Guidelines that makes them different, or less advisory, than any other Guidelines provision. Thus, the District Court erred under *Booker* in treating the crack/powder cocaine sentencing differential incorporated in the Guidelines as mandatory in imposing a final sentence.

*Id*. at * 248-49.

Applying the settled legal principles that have been established within the circuits that have considered this issue to the case *sub judice*, Callahan herein recognizes that this Court is not free to jettison the guideline ratio and construct a new ratio. Instead, Callahan herein respectfully requests this Court take into account the nature of the contraband as well as the severity of the projected guideline sentence and conclude that this yields a sentence that is greater than necessary to satisfy Congress' mandate in sentencing. In the end, a sentencing range of 120-150 months, of which Callahan would be required to do 85% if he were to earn all of the "good-time" to which he is entitled, is greater than necessary.

**The Need to Avoid Unwarranted Sentencing Disparities**

One of Congress' codified mandates in sentencing requires this Court to: (1) avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). To apply the 100:1 ratio undermines these mandates in several ways. First, it creates racial disparity. Crack sentences are imposed disproportionately on minorities. *See, e.g.* United States Sentencing Commission, *2002 Sourcebook of Federal Sentencing Statistics*, Table 34, Race of Drug Offense for Each Drug Type (81.4% of persons sentenced for crack offense are black, whereas only 30.9% of persons sentenced for powder offenses are black), *available at,* http://www.usc.gov/ANNRPT/2002/SBTOC02.htm; *see also*, 2002 Report at 102-03. Even though the disparate racial impact of crack penalties is unassailable,

Congress has decreed "that the guidelines and policy statements are [to be] entirely neutral as to the race . . . of offenders." 28 U.S.C. § 994(d). Further, as the Sentencing Commission has concluded, "even the perception of racial disparity . . . is problematic.

Applying the 100:1 ratio also creates unwarranted jurisdictional disparity. Under Ohio law, both powder cocaine and crack cocaine are Schedule II controlled substances. Like the federal system, the Ohio Revised Code treats crack and powder cocaine differently when it comes to sentencing; offenses involving crack are treated more punitively. 2007 Report at 73. Nonetheless, 36 other jurisdictions treat crack and powder cocaine the same when affixing punishment. *Id*.

Because the overwhelming majority of jurisdictions punish crack and powder cocaine offenses the same, incredible sentencing disparities result. Two individuals committing the same offense will receive dissimilar sentences depending upon the fortuity of whether the federal government exercises jurisdiction. *See* 2002 Report at 81 (stating that "[b]ecause the states generally have not adopted the federal structure for cocaine offenses, the decision whether to prosecute a crack cocaine offense at the federal or state level can have an especially significant effect for a crack cocaine offender").

Perceived improper racial disparity also frustrates Congress' mandates in sentencing as it fosters disrespect for an lack of confidence in the criminal justice system among those very groups that Congress intended would benefit from the heightened penalties for crack cocaine." 2002 Report at 103, *see also*, Fifteen Year Report at 113, 115, 117, and 132. Additionally, applying the 100:1 ratio also fosters disrespect for the law because three of the bases to which the ratio are tethered have been repudiated. For example, while crack is more addictive than cocaine, its addictive nature is grounded in the way crack is consumed. When powder cocaine is injected, it "puts the user at a similar risk of addiction as smoking cocaine, but only 2.8 percent of powder cocaine users inject the

10

drug." 2002 Report at 93-94. Still, the Sentencing Commission has concluded that "[t]he addictive nature of crack cocaine . . . independently does not appear to warrant the 100:1 drug quantity ratio." *Id.* at 94.

Another justification for harsher penalties for crack offenses that was trumpeted in popular culture was that a "crack baby will suffer more harm than a baby whose mother ingests powder cocaine;" however, this justification has been debunked. As the Sentencing Commission observed, "recent research reports no difference between the negative effects from prenatal crack cocaine and powder cocaine exposure, no differential in the drug quantity ratio based directly on this particular heightened harm appears warranted." *Id*. at 94. Finally, "[a]n important basis for the establishment of the 100:1 drug quantity ratio was the belief that crack cocaine trafficking was highly associated with violence." *Id*. at 100. However, "[m]ore recent date indicates that *significantly less* trafficking-related violence or systemic violence, as measured by weapon use . . . is associated with crack cocaine trafficking offenses than previously assumed." *Id*. (emphasis added). In 2000, three-quarters of crack cocaine trafficking offenders (74.5%) did not possess weapons. *Id*. (emphasis in original).

The application of 100:1 ratio not only promotes disrespect for the law; this ratio also does not mesh with the public's perception of the seriousness of the offense. The Sentencing Commission conducted a survey ten years ago from which it concluded that: "perhaps the most important finding [in regard to drug offenses] is that the general public does not make important distinctions between trafficking in heroin, powder cocaine, and crack cocaine . . ." United States Sentencing Commission, *Public Opinion on Sentencing Federal Crimes* at 86 (Oct. 1995), *available at* http://www.ussc.gov/nss/jp_exsum.htm; *see United States v. Wilson*, 350 F. Supp. 2d 910, 918 (D. Utah 2005) (whereas for the most part public opinion converges with guidelines sentences, "[i]t is

11

important to note a few areas of disagreement between the public's views and guidelines sentences;" and in particular, "[t]he public failed to support the guidelines' differentially harsh treatment of distribution of crack cocaine (as compared to powder cocaine.)").

**The need for the sentence imposed to provide the defendant with needed educational and vocational training**.

**CONCLUSION**

Wendell Callahan faces a sentence of imprisonment for his sale of less than one ounce of crack to a confidential informant.  The sales occurred shortly after Callahan's release from prison when he was living at his mother's home.  Callahan faces a lengthy sentence because the substance is punished so harshly under the guidelines.  Callahan has made progress during his period of release and his prospects for the future have brightened.  A sentence below the guidelines is warranted based upon the statutory factors discussed above.

        Respectfully submitted,

        STEVEN S. NOLDER
        ACTING FEDERAL PUBLIC DEFENDER


         /s/   Gordon G. Hobson
        Gordon G. Hobson   (0004681)
        Senior Litigator
        10 West Broad Street, Suite 1020
        Columbus, Ohio 43215-3469
        (614) 469-2999
        Gordon_Hobson@fd.org

        Attorney for Defendant
        Wendell Callahan

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and accurate copy of the Sentencing Memorandum was electronically served upon Kenneth Affeldt, Assistant United States Attorney, Office of the United States Attorney, 303 Marconi Blvd., Suite 200, Columbus, Ohio 43215 this 9th day of November, 2006.

        /s/   Gordon G. Hobson
      Gordon G. Hobson  (0004681)
      Senior Litigator

      Attorney for Defendant
      Wendell Callahan

O:\CallahanWendell\document\SentencingMemo.wpd